Nos. 24-70005, 24-20428

IN THE
# United States Court of Appeals for the Fifth Circuit

GARCIA GLENN WHITE,
*Petitioner–Appellant*

*v.*

BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,
*Respondent–Appellee*

consolidated with

In re GARCIA GLENN WHITE,
*Movant.*

## APPELLEE'S BRIEF AND OPPOSITION TO MOTION FOR A STAY OF EXECUTION

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

JEFFERSON CLENDENIN
Assistant Attorney General
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
jay.clendenin@oag.texas.gov

*Counsel for Respondent*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Respondent*
Bobby Lumpkin, Director
TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

*Counsel for Respondent*
Jefferson Clendenin, Deputy Chief, Criminal Appeals Division
OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Petitioner–Appellant*
Garcia Glenn White

*Counsel for Petitioner–Appellant*

| | |
|---|---|
| Patrick McCann | Julia Bella |
| 700 Louisiana Street, Suite 3950 | 503 FM 359, Suite 130 |
| Houston, Texas 77002 | Richmond, Texas 77406 |
| writlawyer@outlook.com | julia@jbellalaw.com |

s/ Jefferson Clendenin
JEFFERSON CLENDENIN
Assistant Attorney General

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF CONTENTS ...................................................................ii

TABLE OF AUTHORITIES................................................................iv

INTRODUCTION..............................................................................2

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE ..............................................................4

    I.    Facts of the Crime ...................................................... 4

    II.    Evidence Pertaining to Punishment....................................7

        A. Evidence presented by the State.......................................7

        B. Evidence presented by the defense ................................10

    III.    Procedural History .................................................13

SUMMARY OF THE ARGUMENT ......................................................17

STANDARD OF REVIEW.................................................................18

ARGUMENT ..................................................................................18

    I.    This Court Lacks Jurisdiction Over This Appeal.................18

        A. Outside counsel lack authority to bring the appeal.........18

        B. The district court's order is nonappealable......................20

    II.    The District Court Did Not Abuse Its Discretion in Denying White's Motion for Substitution of Counsel...........23

        A. Applicable law...............................................................24

        B. White's substitution request was indisputably untimely.........................................................................26

        C. Substitution of counsel would be futile............................37

1.  White's *Atkins* claim is impermissibly successive. ...................................................................... 37

2.  White's successive *Atkins* claim is time-barred. .... 45

3.  White is not intellectually disabled........................ 49

III.    This Court Should Deny White's Request for a Stay of Execution
.................................................................................................
57

A. White is not entitled to a stay under *McFarland*. ........... 58

B. White is not entitled to a stay under *Nken*. ..................... 60

CONCLUSION ...................................................................................... 63

CERTIFICATE OF SERVICE.................................................................. 64

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....................... 65

ELECTRONIC CASE FILING CERTIFICATIONS .............................. 65

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012) ................................17, 36

*Atkins v. Virginia*, 536 U.S. 304 (2002) ..............................................2, 16

*Battaglia v. Stephens*, 824 F.3d 470 (5th Cir. 2016)...............................24

*Bennett v. United States*, 119 F.3d 470 (7th Cir. 1997)........................41

*Brumfield v. Cain*, 808 F.3d 1041 (5th Cir. 2015) ..................................51

*Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019) ........................................48

*Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393 (5th Cir. 2010).................................................................................................32

*Charles v. Stephens*, 612 F. App'x 214 (5th Cir. 2015) ..........................59

*Christeson v. Roper*, 574 U.S. 373 (2015).......................................*passim*

*Clark v. Davis*, 850 F.3d 770 (5th Cir. 2017)..........................................24

*Crain v. Sec'y, Fla. Dept. of Corr.*, 918 F.3d 1294 (11th Cir. 2019)........20

*Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004) ..........................................47

*Dunn v. Reeves*, 594 U.S. 7317 (2021)......................................................52

*Equip. Corp v. Desktop Direct, Inc.*, 511 U.S. 863 (1994) ......................21

*Ex parte Blue*, 230 S.W.3d 151 (Tex. Crim. App. 2007).........................48

*Ex parte Cathey*, 451 S.W.3d 124 (Tex. Crim. App. 2015...........51, 53, 56

*Ex parte White*, 506 S.W.3d 39 (Tex. Crim. App. 2016).........................14

*Ex parte White*, 2015 WL 375733 (Tex. Crim. App. Jan. 27, 2015) ................................................................................................*passim*

*Felker v. Turpin*, 518 U.S. 651 (1996) .................................................... 36

*Fierro v. Cockrell*, 294 F.3d 674 (5th Cir. 2002) ..................................... 41

*Fisher v. Johnson*, 174 F.3d 710 (5th Cir. 1999) ..................................... 26

*Ford v. Wainwright*, 477 U.S. 399 (1986) ............................................... 60

*Gamboa v. Lumpkin*, 2023 WL 2536345 (5th Cir. Mar. 16, 2023) ......... 21

*Gates v. Cook*, 234 F.3d 221 (5th Cir. 2000) .......................................... 20

*Gilmore v. Utah*, 429 U.S. 1012 (1976) ................................................... 18

*Gonzales v. Wyatt*, 157 F.3d 1016 (5th Cir. 1998) .................................. 18

*Green v. Lumpkin*, 860 F. App'x 930 (5th Cir. 2021) .............................. 50

*Hall v. Florida*, 572 U.S. 701 (2014) ...................................................... 34

*Hamilton v. Collins*, 905 F.2d 825 (5th Cir. 1990) ................................. 18

*Harbison v. Bell*, 556 U.S. 180 (2009) .................................................... 21

*Holiday v. Stephens*, 2015 WL 10733909 (S.D. Tex. Oct. 22, 2015) ....... 26

*Holland v. Florida*, 560 U.S. 631 (2010) ................................................ 45

*In re Baptiste*, 828 F.3d 1337 (11th Cir. 2016) ...................................... 41

*In re Burton*, 111 F.4th 666 (5th Cir. 2024) ........................................... 45

*In re Campbell*, 750 F.3d 523 (5th Cir. 2014) ................................... 44, 48

*In re Cathey*, 857 F.3d 221 (5th Cir. 2017) .................................... *passim*

*In re Hearn*, 376 F.3d 447 (5th Cir. 2004) ............................................. 55

*In re Hearn*, 389 F.3d 122 (5th Cir. 2004) ............................................. 55

*In re Johnson*, 935 F.3d 284 (5th Cir. 2019) .................................. *passim*

*In re Jones*, 998 F.3d 187 (5th Cir. 2021) ...............................................44

*In re Lewis*, 484 F.3d 793 (5th Cir. 2007) ...............................................46

*In re Mathis*, 483 F.3d 395 (5th Cir. 2007) ............................................51

*In re Milam*, 838 F. App'x 796 (5th Cir. 2020)........................................43

*In re Pruett*, 711 F. App'x 732 (5th Cir. 2017) ...........................37, 40, 43

*In re Soliz*, 938 F.3d 200 (5th Cir. 2019).........................................39, 43

*In re Sparks*, 939 F.3d 630 (5th Cir. 2019) .............................................45

*In re Swearingen*, 935 F.3d 415 (5th Cir. 2019) ...............................39, 40

*In re Webster*, 605 F.3d 256 (5th Cir. 2010) ...........................................37

*In re White*, 602 F. App'x 954 (5th Cir. 2015) ................................*passim*

*Johnson v. Davis*, 2019 WL 13440694 (S.D. Tex. Aug. 12, 2019).....29, 30

*Jones v. Stephens*, 541 F. App'x 499 (5th Cir. 2013) ..............................46

*La Union del Pueblo Entero v. Abbott*, 93 F.4th 310 (5th Cir. 2024) ............................................................................................................2

*Leonard v. Martin*, 38 F.4th 481 (5th Cir. 2022)....................................21

*Lovelace v. Lynaugh*, 809 F.2d 1136 (5th Cir. 1987) .........................2, 18

*McFarland v. Scott,* 512 U.S. 849 (1994) .........................................57, 59

*Magwood v. Patterson*, 561 U.S. 320 (2010) ..........................................38

*Manning v. Epps*, 688 F.3d 177 (5th Cir. 2012) .....................................47

*Martel v. Clair*, 565 U.S. 648 (2012) ..............................................*passim*

*Moore v. Texas*, 581 U.S. 1 (2017) ...........................................48, 50, 52
*Moore v. Texas*, 586 U.S. 133 (2019) .....................................................52

*Mullis v. Lumpkin*, 70 F.4th 906 (5th Cir. 2023) ................................. 41

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................... 59

*Petetan v. State*, 622 S.W.3d 321 (Tex. Crim. App. 2021) ............... 48, 51

*Rumbaugh v. Procunier*, 753 F.2d 395 (5th Cir. 1985) ........................ 18

*Smith v. Kelly*, 301 F. App'x 375 (5th Cir. 2008) ................................. 46

*Speer v. Stephens*, 781 F.3d 784 (5th Cir. 2015) .................................. 27

*Thomas v. Scott*, 47 F.3d 713 (5th Cir. 1995) ..................................... 20

*Tracy v. Lumpkin*, 43 F.4th 473 (5th Cir. 2022) ........................... *passim*

*United States v. Crocket*, 181 F.3d 96, 1999 WL 346943 (5th Cir. May 10, 1999) ................................................................................... 17

*United States v. Jones*, 796 F.3d 483 (5th Cir. 2015) ........................... 37

*United States v. Vargas-Soto*, 35 F.4th 979 (5th Cir. 2022) ................. 41

*Van Cauwenberghe v. Biard*, 486 U.S. 517 (1988) ............................... 19

*Walker v. Epps*, 287 F. App'x 371 (5th Cir. 2008) .............................. 59

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ...................................... 18

*Wilkins v. Davis*, 832 F.3d 547 (5th Cir. 2016) .................................. 23

*Will v. Hallock*, 546 U.S. 345 (2006) ................................................ 19

*Woods v. Warden, Holman Corr. Facility*, 952 F.3d 1251 (11th Cir. 2020) ........................................................................................... 28

## Statutes

18 U.S.C. § 3599(e) ........................................................................ 23

28 U.S.C. § 1291 ............................................................................ 19

28 U.S.C. § 2242 ...................................................................... 18

28 U.S.C. § 2244(b) ................................................................. 37

28 U.S.C. § 2244(b)(1) ............................................................ 37

28 U.S.C. § 2244(b)(2)(A) .................................................. 37, 39

28 U.S.C. § 2244(d)(1) ............................................................ 44

28 U.S.C. § 2244(b)(3)(A) ....................................................... 36

28 U.S.C. § 2255 ...................................................................... 40

28 U.S.C. § 2255(h) ................................................................. 40

28 U.S.C. § 3599 .......................................................... 24, 57, 58

Texas Code of Criminal Procedure, Article 11.071 § 5 ..................... 13, 14

# INTRODUCTION

Petitioner–Appellant Garcia White was convicted and sentenced to death in 1996 for the murders of sixteen-year-old twins Annette and Bernette Edwards. He killed Annette and Bernette's mother, Bonita, in the same gruesome attack, and he has also killed Greta Williams and Hai Pham. *White v. Thaler*, No. H-02-1805, 2011 WL 4625361, at *1–2 (S.D. Tex. Sept. 30, 2011). The state trial court scheduled White to be executed after 6:00 p.m. (Central Time) on October 1, 2024.

White has unsuccessfully challenged his conviction and death sentence in state and federal court. He has been continuously represented by appointed counsel, Patrick McCann, for more than twenty years. ROA.253. McCann has ably represented White, challenging White's conviction and sentence in multiple forums and obtaining a stay of White's previously scheduled execution in 2015, *Ex parte White*, No. WR-48,152-08, 2015 WL 375733, at *1 (Tex. Crim. App. Jan. 27, 2015). Nonetheless, with McCann continuing to zealously advocate for him,[1]

---

[1]    McCann has, for example, recently filed on White's behalf a clemency application, a subsequent state habeas application raising among other claims an intellectual disability claim under *Atkins v. Virginia*, 536 U.S. 304 (2002),

2

White filed plainly dilatory motions for substitution of counsel and a stay of execution arguing that McCann has failed to adequately represent him. ROA.1248–81. At bottom, White's motions sought to reinitiate his long-dormant federal habeas proceedings. The district court denied White's motions. ROA.2054–70. Despite their request for appointment being denied, outside counsel then filed the instant appeal. ROA.2071. For the reasons discussed below, this Court should dismiss the appeal or, alternatively, affirm the district court's order.

## STATEMENT OF JURISDICTION

This Court lacks jurisdiction over this appeal because outside counsel were unauthorized to bring it, and it is an appeal of an unappealable order. *La Union del Pueblo Entero v. Abbott*, 93 F.4th 310, 315 (5th Cir. 2024); *Tracy v. Lumpkin*, 43 F.4th 473, 475–76 (5th Cir. 2022); *Lovelace v. Lynaugh*, 809 F.2d 1136, 1137 (5th Cir. 1987).

---

a motion for authorization seeking permission to file a successive federal petition, a Rule 60(b) motion, and a lawsuit challenging the Texas Board of Pardons and Paroles' procedures. Mot. for Auth., *In re White*, No. 24-20428 (5th Cir. Sept. 24, 2024), ECF No. 2; Comp., *White v. Abbott, et al.*, No. 1:24-CV-1136 (W.D. Tex. Sept. 25, 2024); Order, *Ex parte White*, No. WR-489,152-09 (Tex. Crim. App. Sept. 18, 2024).

## STATEMENT OF THE ISSUES

1.    Whether this Court has jurisdiction over this appeal that was brought by counsel who have not been appointed to represent White and where the appeal is from a nonappealable order?

2.    Whether the district court abused its discretion in denying White's motion for substitution of counsel?

3.    Whether the district court abused its discretion in denying White's motion for a stay of execution?

## STATEMENT OF THE CASE

### I.    Facts of the Crime

In late November 1989, Annette, Bernette, and their mother Bonita Edwards were found inside their apartment, one just inside the front door, one in the dining area, and one in a bedroom. 15 RR 60.[2] Annette

---

[2]    "RR" refers to the "Reporter's Record," the transcribed proceedings of White's trial, preceded by the volume number and followed by the page number(s) cited. "CR" refers to the "Clerk's Record," the transcript of pleadings and documents filed in the trial court, followed by the internal page number(s). "SX" refers to the State's Exhibits admitted at White's trial. "SCHR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court. *See generally Ex parte White*, No. WR-48,152-01.

was lying face down semi-nude with her head on a pillow and a blanket partially covering her. 15 RR 75–76. Her twin sister Bernette had a towel wrapped around her neck and shoved into her mouth. 15 RR 85. Bonita was clothed but had blood on her shirt. 15 RR 78, 83. The three women had sustained multiple stab wounds to the neck and chest and had been dead for several days. 15 RR 83–84, 146–47. Although there was no sign of a forced entry into the apartment, the telephone was off the receiver, and it appeared the bedroom door had been forced open. 15 RR 70, 73, 91, 151. It appeared that Annette, who was found in the bedroom, may have been sexually assaulted. 15 RR 153. Moreover, blood was found on the walls and on numerous items in the apartment, including the bathtub and kitchen sink. 15 RR 76–78, 83, 88–100, 109–10, 151.

The initial interviews of witnesses proved to be fruitless, and the crime remained unsolved for nearly six years. 15 RR 153–56. However, in July of 1995, the police finally received a break in the case. During an interview regarding an unrelated murder of a convenience store owner involving White, Tecumseh Manuel, a close friend of White's, told the police that White admitted to killing the Edwards family. 16 RR 185–86, 189–90. Officer Todd Miller took a statement from Manuel on July 20,

5

1995, and arrested White the following day. 15 RR 190. Miller contacted Sergeant Rudolph because he had been involved in the original investigation of this case, and Rudolph questioned White for several hours during the early morning of July 22, 1995. 15 RR 157–59; 16 RR 193–94. White denied involvement in the murders during the interview and believed the police were lying to him about Manuel implicating him in the crime. 15 RR 161. Miller showed White a portion of the taped statement from Manuel. 15 RR 161; 16 RR 195. Afterwards, Miller asked White if he was ready to tell the truth, and White said he was. 16 RR 195–96.

White then gave a videotaped statement of his version of the murders. 15 RR 162; 16 RR 196. The gist of White's statement was that he and Terrence Moore went over to Bonita's apartment to do drugs and have sex with her. SX 55A. They both tried to have sex with Bonita and, after they failed, Bonita got mad because they would not share the drugs with her. *Id.* A fight ensued, and Moore ended up stabbing all of the women. *Id.* White acknowledged during the interview that Terrence Moore was no longer alive. *Id.*

The police investigated Moore's death and discovered Moore had been killed on July 25, 1989, four months before the Edwards were murdered. 16 RR 205–06, 224. Miller and Rudolph confronted White with this discrepancy, and then White gave another taped statement. *Id.* at 206–09. In this brief statement, White admitted that he made up the story involving Moore, and he confessed to killing all three women himself. SX 56A. Further, serology and DNA testing revealed that semen found on a beige sheet in one of the bedrooms was consistent with White's DNA, and blood found on the same sheet was consistent with the DNA of either Annette or Bernette. 16 RR 240–41; 17 RR 381–384. DNA retesting conducted in 2006 further incriminated White. ROA.1124–25.

## II.    Evidence Pertaining to Punishment.

### A.    Evidence presented by the State

During the punishment phase, the State proved White had committed two prior murders, including one capital murder. With regard to the capital murder, Hau Pham, a sixteen-year-old immigrant from Vietnam, testified that on July 13, 1995, two men came into his father's convenience store and robbed it. 19 RR 33–34. Around 3:00 p.m. that day, Hau heard a scream, and then one of the men grabbed him by the neck

and told him to open the register. 19 RR 34–35. Hau recognized the men because they had been in the store earlier in the day. 19 RR 34. One man was "fat," and the other had a medium build. 19 RR 35–36. Hau saw his father, Hai Pham, lying on the floor with blood on him. 19 RR 37. The men took some cigarettes and walked out of the store. 19 RR 38. Hai died several days later from multiple blunt traumas to the head with skull fractures, brain contusions, and associated complications. 19 RR 47, 83–84. Hau was shown photographs of possible suspects and identified White as the "fat" man. 19 RR 46–47, 62–64. Officer Miller then obtained a warrant for White's arrest, and White gave a videotaped statement admitting his involvement in the crime. *Id.* at 64–69. In the statement, White said he grabbed Hai Pham, threw him to the floor, hit him several times, and kicked him in the chest when he tried to get up. SX 98. White was charged with capital murder. 19 RR 65.

With regard to the second offense, several Houston police officers testified that, on November 1, 1989, they were dispatched to an abandoned house. 20 RR 114, 121–22. When officers arrived, White and Raymond Manuel were at the scene. 20 RR 121. Officer Philip Clark pulled away plywood from one of the windows and saw a body lying in a

8

back room. 20 RR 116. When homicide officer Wayne Wendel arrived, he found the body of a black female, Greta Williams, beaten to death and covered in carpet. 20 RR 122–23, 134. Greta's body was in the early stages of decomposition, and there was evidence of head trauma. 20 RR 129. Broken teeth were by her neck, and blood spatter on the walls indicated that she sustained repeated blows. 20 RR 131–32. An autopsy revealed that Greta had been struck by a blunt object at least ten times and died from trauma to the head, face, chest, and abdomen. 20 RR 189–95.

When White was initially questioned about the incident, he gave a statement in which he admitted seeing Greta walking down the street but denied having anything to do with her murder. 20 RR 178–79. White was charged with the murder, and the case was presented to a grand jury on November 29, 1989. 20 RR 141–42. At that time, however, White was "no billed" because there was insufficient evidence for the grand jury to present the indictment. 20 RR 142. But when the police questioned Tecumseh Manuel about his knowledge of the Hai Pham murder, Manuel told the police that White told him about his involvement in both the instant case and Greta Williams's murder. 19 RR 67.

The police confronted White with this new information, and White agreed to give another statement regarding his involvement in Greta's death. 20 RR 207–08. White stated that he approached Greta and offered to pay her for sex. SX 116A. They went to the abandoned house and had sex. *Id.* Afterward, White believed that Greta had taken some of his money. *Id.* When he started to walk away, Greta pulled his shirt and started hitting him. *Id.* White hit her hard about three times, and Greta fell to the ground. *Id.* White then rolled Greta up in carpet and left. *Id.* White further stated that he and Manuel came back to the house two weeks later and noticed a foul odor coming from the house. *Id.* Although White knew it was Greta's body that was causing the smell, he told Manuel that it was probably a dead dog, and they ended up calling the dog pound. *Id.* According to White, the health department contacted the police when they found Greta's body inside. *Id.*

## B.   Evidence presented by the defense

White's first two witnesses were his mother and sister, who testified regarding White's childhood, character, family, problems related to injuries and work, and drug use. 21 RR 230–78. White's mother, Lizzie White, testified that White was a poor student in school but had good

conduct records, was only disciplined once, and got along well with his siblings. 21 RR 230–37. White was a starter on the Wheatley High football team, wanted to play college and pro football, and got accepted to Lubbock Christian College to play football. 21 RR 237–39. However, White injured his knee during his first semester, which terminated his football career, and he dropped out of school. 21 RR 239–40. White came back home and, after working several jobs, he got a job with Clean America sandblasting buildings. 21 RR 240–44. Eventually, he was promoted to crew leader. 21 RR 244. However, in March of 1988, he sustained a serious fall on the job and was hospitalized. 21 RR 245–46. The injury resulted in pain and drug use, and White started hanging around drug abusers. 21 RR 246–49. Although White's medical records were not available, records were produced showing White had been admitted and discharged from the hospital around that time. 21 RR 283. Further, although White had three children whom he loved and was separated from his common-law wife, he was a poor provider and was behind on his child support payments due to his drug use. 21 RR 249–53. Lizzie asked the jury to spare her son's life. 21 RR 254.

Monica Garrett, White's sister, testified to similar effect as her mother. She stated White was a nice brother who got along well with his siblings. 21 RR 271. White had difficulty in school. 21 RR 271. She tried to help White with his grades but to little avail. 21 RR 271–72. Monica and her siblings considered White to be a football hero. 21 RR 272–73.

White then presented two expert witnesses. Robert Yohman, a clinical neuropsychologist, testified that he conducted a battery of tests on White and reviewed records provided by White's attorneys. 21 RR 308–13. Yohman's examination showed, among other things, that White had an IQ of 76, which was in the borderline range of intellectual functioning but not in the range of intellectual disability. 21 RR 315–16. Dennis Nelson, a psychologist, testified that he examined White and conducted various tests on White's intellectual and emotional functioning, as well as his personality. 21 RR 387, 390. According to screening tests, White had an estimated IQ of 85 or 87. 21 RR 391.

On rebuttal, the State presented a probation officer, John Thomas, who stated that on March 20, 1995, White received a probated three-year sentence for theft. 21 RR 451–52. As part of his alcohol and drug evaluation, he was referred to a program but did not follow through. 21

RR 454–55. Further, although White admitted to using drugs on his personal data sheet, he denied being a drug abuser. 21 RR 453–54.

## III.  Procedural History

White was convicted and sentenced to death for the murder of Annette and Bernette Edwards. CR 5, 222, 233–36, 242–43. The Texas Court of Criminal Appeals (CCA) upheld White's conviction and death sentence on direct appeal. Op., *White v. State*, No. AP-72,580 (Tex. Crim. App. June 17, 1998).

White then filed a state application for a writ of habeas corpus in the trial court. SHCR-01 at 2–109. The trial court entered findings of fact and conclusions of law recommending that White be denied relief. *Id.* at 259–290. The CCA adopted the trial court's findings and conclusions and denied relief. Order, *Ex parte White,* No. WR-48,152-01 (Tex. Crim. App. Feb. 21, 2001). White also filed a second state habeas application, which the. CCA dismissed as an abuse of the writ. Order, *Ex parte White,* No. WR-48,152-02 (Tex. Crim. App. Apr. 24, 2002).

White then filed a federal habeas petition. ROA.287–373. The district court granted White an administrative stay pending the outcome of DNA retesting. ROA.759–62. White later filed two additional state

habeas applications, which the CCA dismissed pursuant to Art. 11.071, § 5(a) of the Texas Code of Criminal Procedure. Order, *Ex parte White*, Nos. WR-48,152-03, -04 (Tex. Crim. App. May 6, 2009). Following DNA retesting and the state court's dismissal of those applications, the district court lifted the stay. ROA.786. White filed an amended petition on December 31, 2009, ROA.787–882, after which the Director filed a motion for summary judgment, ROA.1077–116. The district court then granted the Director's motion for summary judgment, denied White's petition, and denied White a certificate of appealability (COA). *White v. Thaler*, 2011 WL 4625361, at *15. Next, White filed an application for a COA, which this Court denied. *White v. Thaler*, 522 F. App'x 226, 236 (5th Cir. 2013), *cert. denied*, 571 U.S. 1133 (2014).

Thereafter, the convicting court scheduled White's execution for January 28, 2015. On January 8, 2015, White filed in the CCA a Motion for Leave to file an Original Petition for a Writ of Habeas Corpus, a Motion for Leave to file a Petition for a Writ of Prohibition, and a Motion for a Stay of Execution. SHCR-05, -06. The CCA denied White's motions on January 15, 2015. *Id*. White then filed in this Court a Motion for

Authorization to File a Successive Federal Habeas Petition, which was denied. *In re White*, 602 F. App'x 954, 958 (5th Cir. 2015).

Subsequently, White filed in state court, on January 19 and January 20, 2015, respectively, a Motion for Leave to File a Petition for Writ of Prohibition and his fourth subsequent state habeas application. SHCR-07, -08. The CCA denied the Motion for Leave to File a Petition for a Writ of Prohibition on January 21, 2015. SHCR-07. The United States Supreme Court ultimately denied certiorari review. *White v. Texas,* 135 S. Ct. 1510 (2015). The CCA issued an order staying White's execution based on the subsequent habeas application. *Ex parte White*, 2015 WL 375733, at *1. The CCA ultimately dismissed the application pursuant to Article 11.071, § 5. *Ex parte White,* 506 S.W.3d 39, 52 (Tex. Crim. App. 2016), *cert. denied*, 583 U.S. 850 (2017).

The state trial court then scheduled White's execution for October 1, 2024. White's appointed counsel, McCann, filed in state court an application for a writ of habeas corpus and a motion to withdraw the trial court's execution order. On September 3, 2024, the state trial court denied White's motion to withdraw the execution order. The CCA dismissed White's state habeas application and denied his motion for a

stay of execution on September 18, 2024. Order, *Ex parte White*, No. WR-48,152-09 (Tex. Crim. App. Sept. 18, 2024). On September 18, 2024, White filed in the CCA a motion for leave to file a petition for a writ of prohibition. The motion for leave and White's request for a stay of execution were denied without written order on September 25, 2024. *In re Garcia White*, Nos. WR-48,152-10, -11 (Tex. Crim. App. Sept. 25, 2024).

On September 13, 2024, outside counsel filed a motion in White's concluded federal habeas proceedings for substitution of counsel and a stay of execution. ROA.1248–81. The district court denied both motions. ROA.2054–70. Outside counsel filed a notice of appeal regarding that denial. ROA.2071. This brief follows.

On September 23, 2024, White filed motions for relief from judgment and for a stay of execution. ROA.2005–13. The motions remain pending.

On September 24, 2024, White filed a motion in this Court for authorization to file a successive federal habeas petition. Mot., *In re White*, No. 24-20428 (5th Cir. Sept. 24, 2024), ECF No. 2. The motion is pending.

On September 25, 2025, White filed a civil rights complaint in federal district court. Comp., *White v. Abbott, et al.*, No. 1:24-CV-1136 (W.D. Tex. Sept. 25, 2024). The complaint is pending.

## SUMMARY OF THE ARGUMENT

This Court lacks jurisdiction over the instant appeal because it is unauthorized, as it is brought by counsel who have not been appointed to represent White. This Court also lacks jurisdiction over this appeal because it is an appeal from a nonappealable order. Even if this Court had jurisdiction to consider this appeal, it should affirm the lower court's denial of White's motions for substitution of counsel and a stay of execution. The motions were indisputably dilatory. The asserted basis for substitution—appointed counsel's purported failure to timely raise a claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), that White is ineligible for execution—has existed for *at least* five years. Moreover, White was not entitled to substitution of counsel for the purpose of raising a futile *Atkins* claim. Lastly, White was also not entitled to a stay of execution after having waited until mere days before his second scheduled execution date to request substitution of counsel.

17

## STANDARD OF REVIEW

A district court's denial of motions for substitution of counsel and a stay of execution are reviewed for abuse of discretion. *Martel v. Clair*, 565 U.S. 648, 664 (2012); *Adams v. Thaler*, 679 F.3d 312, 318 (5th Cir. 2012).

## ARGUMENT

## I.    This Court Lacks Jurisdiction Over This Appeal.

This appeal should be dismissed because this Court lacks jurisdiction to consider it for two reasons. First, the appeal is taken by outside counsel who are unauthorized. Second, the appeal is from an interlocutory, nonappealable order.

### A.    Outside counsel lack authority to bring the appeal.

Outside counsel sought an order in the lower court to be substituted as White's appointed counsel. ROA.1248–81. The district court denied the request. ROA.2054–70. Nonetheless, outside counsel filed a notice of appeal despite the lack of authorization to represent White. That lack of authorization deprives this Court of jurisdiction to consider this appeal. *See United States v. Crocket*, 181 F.3d 96, 1999 WL 346943, at *1 (5th Cir. May 10, 1999) ("The notice of appeal must be signed by the party *or his attorney*, and nonlawyers who have not obtained next friend status

18

are not authorized to represent others or sign their pleadings." (emphasis added) (citing *Gonzales v. Wyatt*, 157 F.3d 1016, 1020–22 (5th Cir. 1998)); *cf. La Union del Pueblo Entero*, 93 F.4th at 315 ("[N]on-parties generally cannot appeal an order or judgment.").

Relatedly, outside counsel lack standing as "next friend." 28 U.S.C. § 2242 (authorizing "someone acting in [the inmate's] behalf" to sign a petition); 28 U.S.C. foll. § 2254 Rule 2(c)(5); *see Whitmore v. Arkansas*, 495 U.S. 149, 162–63 (1990) (defining "next friend" standing). Such standing may exist if it is demonstrated that the individual is unable to seek relief on his own behalf or is mentally incompetent to do so. *Lovelace v. Lynaugh*, 809 F.2d 1136, 1137 (5th Cir. 1987) (citing *Gilmore v. Utah*, 429 U.S. 1012, 1014 (1976)). The person acting on an inmate's behalf has the burden of showing the inmate is incompetent. *Rumbaugh v. Procunier*, 753 F.2d 395, 398–99 (5th Cir. 1985). The failure to make that showing deprives this Court of jurisdiction. *Hamilton v. Collins*, 905 F.2d 825, 828–29 (5th Cir. 1990); *Lovelace*, 809 F.2d at 1138.

There has been no showing White is incompetent. And even if he was, as shown by the currently pending litigation filed by McCann, White is ably represented by appointed counsel. Outside counsel's "generalized

19

interest in constitutional governance" is insufficient to give it standing to circumvent the district court's denial of their request to be appointed. *Whitmore*, 495 U.S. at 164. Therefore, this Court should dismiss the appeal.

**B.     The district court's order is nonappealable.**

This Court has held it lacks jurisdiction under the collateral order doctrine to review the interlocutory denial of a motion for substitution of federal habeas counsel. *Tracy v. Lumpkin*, 43 F.4th 473, 477 (5th Cir. 2022). In *Tracy*, this Court explained it has jurisdiction over final decisions of a district court. *Id*. at 475 (citing 28 U.S.C. § 1291). A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute judgment." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 521 (1988). Other decisions may be appealed only if they satisfy the "narrow" collateral-order doctrine. *Id*. An order is appealable if it: (1) "conclusively determine[s] the disputed question"; (2) "resolve[s] an important issue completely separate from the merits of the action"; and (3) "[is] effectively unreviewable on appeal from a final judgment." *Id*. (quoting *Will v. Hallock*, 546 U.S. 345, 347 (2006)). This Court held in *Tracy* that an order denying substitution of counsel fails to satisfy the

third requirement.[3] *Id.* at 476; *see Crain v. Sec'y, Fla. Dept. of Corr.*, 918 F.3d 1294, 1296 (11th Cir. 2019) (per curiam); *see also Thomas v. Scott*, 47 F.3d 713, 715–16 (5th Cir. 1995).

As in *Tracy*, the denial of White's motion for substitution of counsel is not effectively unreviewable. The district court explained at length that, if this Court permits White to file a successive habeas petition, this Court will be able to determine issues related to the successiveness and timeliness of White's proposed successive *Atkins* claim. ROA.2064–66. The denial of his request for substitution of counsel would be reviewable after final judgment. *See Tracy*, 43 F.4th at 476. Indeed, the district court's order explicitly contemplated that additional proceedings would take place. ROA.2064–66.

White will likely argue that his scheduled execution date renders the district court's order "effectively" unreviewable, but Respondent is not aware of any such exception to the collateral order doctrine. *See*

---

[3]     In *Gates v. Cook*, 234 F.3d 221, 228 n.5 (5th Cir. 2000), this Court declined to reach the issue in a § 1983 action of whether a post-judgment motion to substitute counsel was independently appealable because the Court had interlocutory jurisdiction over an injunctive order.

*Leonard v. Martin*, 38 F.4th 481, 486 (5th Cir. 2022) ("An order is not 'effectively unreviewable' just because 'it may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment.'" (quoting *Digit. Equip. Corp v. Desktop Direct, Inc.*, 511 U.S. 863, 872 (1994)). In an analogous context, this Court has declined to find jurisdiction where it could not "grant any effectual relief," despite the petitioner's "troubling" allegations of attorney abandonment and his argument that his appointed counsel conceded the petition he filed raised only foreclosed claims. *Gamboa v. Lumpkin*, 2023 WL 2536345, at *1 (5th Cir. Mar. 16, 2023). This Court should similarly decline to find jurisdiction where it does not exist. Therefore, this Court should dismiss the appeal. *Tracy*, 43 F.4th at 476–77.

White does not acknowledge this Court's holding in *Tracy*. However, he seems to characterize the denial of his motion for substitution of counsel as appealable because it was "post-judgment." Appellant's Br. 9. White cites to *Harbison v. Bell*, 556 U.S. 180 (2009), *Christeson v. Roper*, 574 U.S. 373 (2015), and *Martel v. Clair*, 565 U.S. 648 (2012), for support. The Supreme Court in *Harbison* stated a denial of a motion regarding the scope of appointed counsel's representation was

an appealable order under § 1291. 556 U.S. at 183. In *Christeson*, the petitioner sought to challenge the district court's judgment with new counsel. 574 U.S. at 380. Similarly, in *Clair*, the district court denied substitution of counsel and the petitioner's Rule 60(b) motion from which the petitioner appealed. 565 U.S. at 656.

But White is not appealing from or attacking the district court's final judgment. Instead, he argues his appointed counsel suffers from a potential future conflict of interest in a proceeding over which no court currently has jurisdiction. In that way, White's motion for substitution was pre-judgment because it preceded even the filing of a successor habeas petition that outside counsel wish to file. Under *Tracy*, White's appeal should be dismissed because he appeals from a nonfinal, nonappealable order. 43 F.4th at 476. Therefore, this appeal should be dismissed for want of jurisdiction.

## II.    The District Court Did Not Abuse Its Discretion in Denying White's Motion for Substitution of Counsel.

Outside counsel appeal from the district court's denial of the motion for substitution of counsel. Assuming this Court has jurisdiction, it should affirm the district court's order because it was no abuse of

discretion. White's motion was indisputably dilatory, and substitution of counsel would be futile.

## A. Applicable law

Section 3599 of Title 18 "entitles indigent defendants to the appointment of counsel in capital cases, including habeas corpus proceedings." *Martel v. Clair*, 565 U.S. 648, 652 (2012). Appointed counsel

> shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

18 U.S.C. § 3599(e). Appointed counsel is obligated to continue representing the inmate unless and until a court of competent jurisdiction grants a motion to withdraw. *Wilkins v. Davis*, 832 F.3d 547, 557–58 (5th Cir. 2016). When an indigent defendant moves for the appointment of substitute counsel under § 3599, a court must review the motion under the "interests of justice" standard. *Clair*, 565 U.S. at 652.

24

An indigent petitioner does not have an absolute right to the counsel of his choice. *Christeson*, 574 U.S. at 377. This Court has held, however, that "[c]apital habeas petitioners have a statutory right [under § 3599] to conflict-free counsel." *Clark v. Davis*, 850 F.3d 770, 779 (5th Cir. 2017). But § 3599 does not create an independent enforcement mechanism for an aggrieved prisoner to seek a remedy from a federal court about the scope of representation provided to a prisoner with federal funds. *Beatty v. Lumpkin*, 52 F.4th 632, 636 (5th Cir. 2022).

The Supreme Court and this Court have identified various factors that guide appellate review of the denial of a motion for substitution of counsel: "the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for the complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict)." *Clair*, 565 U.S. at 663; *see Battaglia v. Stephens*, 824 F.3d 470, 472 (5th Cir. 2016). Review of a substitution request is, therefore, necessarily fact and context specific. *Clair*, 565 U.S. at 663–64. As discussed below, White's motion for substitution of counsel was indisputably untimely, and he was not

entitled to new counsel for the purpose of filing a futile motion for authorization to file a successive habeas petition.

## B. White's substitution request was indisputably untimely.

Almost a decade after he was previously scheduled to be executed, White requested a last-minute change of counsel. He sought substitution to tread the same path—the filing of a motion for authorization to raise a successive *Atkins* claim based on purported ineffectiveness of appointed counsel—paved by Dexter Johnson *five years* ago. *See In re Johnson*, 935 F.3d 284, 291 (5th Cir. 2019).

White's federal habeas proceedings concluded almost eleven years ago. *White v. Stephens*, 571 U.S. 1133 (2014). He was previously scheduled to be executed in January 2015. *See Ex parte White*, 2015 WL 375733, at *1. Prior to that date, White attempted to secure assistance from new counsel due to his dissatisfaction with McCann. ROA.1537–40 (White's letters to Richard Ellis in November and December 2014). However, McCann secured a stay of White's then-scheduled execution. *Ex parte White*, 2015 WL 375733, at *1. After succeeding with McCann's assistance, White abandoned his quest for substitute counsel and waited almost a decade, and until only weeks remained before his currently

scheduled execution, to again seek new counsel. ROA.1535–36. The dilatory nature of White's request for substitution of counsel was reason enough to deny it. *See Christeson*, 574 U.S. at 380. Indeed, the fact that White, himself, has at least twice sought assistance from outside counsel not only undercuts his assertion that he is intellectually disabled,[4] but it also underscores that the true purpose of the last-minute request was delay. *See Holiday v. Stephens*, No. H-11-1696, 2015 WL 10733909, at *1 (S.D. Tex. Oct. 22, 2015) ("Little time remains before Holiday's execution date. If a new attorney were appointed, he or she would invariably argue that the pending execution date must be stayed to become familiar with the case."), *aff'd*, 806 F.3d 334 (5th Cir. 2015).

As an example, in the statute-of-limitations context, a pro se inmate's lack of diligence may be excused by periods of mental incompetency but only for the time the condition prevented him from pursuing his legal rights. *Fisher v. Johnson*, 174 F.3d 710, 715–16 (5th Cir. 1999). But White cannot justify a *decade* of inaction after exhibiting

---

[4]    *See Atkins*, 536 U.S. at 320 (explaining that one basis for the Eighth Amendment's prohibition on execution the intellectually disabled is that they "may be less able to give meaningful assistance to their counsel").

the ability and willingness to express his dissatisfaction with McCann in 2014. Indeed, the substitution request and motion for a stay were explicit that they sought delay. ROA.1271 (asserting the need for new counsel to investigate an *Atkins* claim and McCann's purported conflict of interest). Consequently, it was in the interests of justice to deny last-minute substitution of counsel. *See Clair*, 565 U.S. at 662 ("Protecting against abusive delay *is* an interest of justice." (emphasis in original)). This is particularly true where McCann has ably represented White for more than twenty years, McCann continues to do so, and White only sought court intervention at the last minute so he could reinitiate his federal habeas proceedings. *See Speer v. Stephens*, 781 F.3d 784, 786 (5th Cir. 2015) (appointing supplemental, not substitute, counsel where the petitioner sought new counsel "late in the process" but during the initial federal habeas proceedings and recognizing appointed counsel's experience in the case as a "rich resource").

The Supreme Court in *Christeson* found the petitioner's substitution request, "while undoubtedly delayed, was not abusive" where it was filed "well before the State had set an execution date" and only one month after outside counsel learned of the petitioner's

28

predicament with his appointed counsel, and it requested only ninety days to investigate. 574 U.S. at 380. White's motion for substitution was not only "undoubtedly delayed," *id.*, it was indisputably abusive. Indeed, it came a decade after White initially expressed to outside counsel his displeasure with McCann in 2014. ROA.1537–39. As noted above, McCann secured a stay of White's previously scheduled execution in 2015, after which White appears to have been content not to seek new counsel until *another* execution date was set almost a decade later. This entirely distinguishes White's case from *Christeson*.

White relies largely, if not entirely, on McCann's alleged conflict of interest in seeking to raise an *Atkins* claim in federal court where doing so would supposedly require him to admit his own error to justify the claim's successiveness or untimeliness. ROA.1255. But the Supreme Court has made clear that review of a substitution request is "a peculiarly context-specific inquiry," *Clair*, 565 U.S. at 663, so the asserted basis for substitution is no trump card, *see id.* Indeed, White's is one of the "many cases," *Christeson*, 574 U.S. at 380, where delay warrants denial of substitution. *See Woods v. Warden, Holman Corr. Facility*, 952 F.3d 1251, 1255–56 (11th Cir. 2020) (denying motions for substitution of counsel and

a stay of execution where petitioner requested substitution shortly before his scheduled execution "despite his assertion that he has never been satisfied with his representation" and despite the petitioner's assertion that his clemency counsel recently discovered new evidence weeks earlier). And as demonstrated by the motion for authorization recently filed by McCann, the alleged conflict of interest that White continuously asserts exists did not prevent McCann from filing the motion. Nothing in that motion required McCann to admit fault or attack his own performance to justify authorization of a successive *Atkins* claim. The conflict White has assured the courts exists is evanescent.

White's substitution request was also more abusive than Dexter Johnson's, who was previously represented by McCann and whose case White attempts to pattern his on. ROA.1255. There, Johnson's execution was scheduled in December 2018 for May 2, 2019. *Johnson v. Davis*, No. 4:11-CV-2466, 2019 WL 13440694, at *3 (S.D. Tex. Aug. 12, 2019). About a month after the date was scheduled, Johnson wrote to the federal district court to request new counsel. Letter, *Johnson v. Davis*, No. 4:11-CV-2466 (S.D. Tex. Jan. 18, 2019), ECF No. 65. With months remaining prior to Johnson's scheduled execution, the district court appointed

supplemental counsel to determine whether Johnson could successfully raise new claims. *Johnson v. Davis*, 2019 WL 13440694, at *4. A month prior to Johnson's scheduled execution, supplemental counsel filed a motion to terminate McCann's appointment and a motion for a stay of execution. Opposed Mot. for Stay of Execution, *Johnson v. Davis*, No. 4:11-CV-2466 (S.D. Tex. Apr. 8, 2019), ECF No. 77; Opposed Mot. to Terminate Patrick F. McCann's Appointment, *Johnson v. Davis*, No. 4:11-CV-2466 (S.D. Tex. Apr. 5, 2019), ECF No. 76.

Here, as discussed above, White expressed dissatisfaction with McCann a decade ago, ROA.1537–39, but it appears he took no action to remedy that dissatisfaction after McCann secured him a stay of execution in 2015. Nor did White do so soon after the state court scheduled his current execution date in June this year. By White's telling, he waited until late August to contact outside counsel. ROA.1272. White attempted to leverage the lateness of his request to justify substitution of counsel and a consequent stay of execution, but this gets it backwards. The lateness weighed against White. *See Christeson*, 574 U.S. at 380. White cannot use his dissatisfaction with McCann—which he seems to have

expressed only with a pending execution date—to justify starting his habeas proceedings over.

Aside from White's own expression a decade ago of his dissatisfaction with McCann, his substitution request was untimely considering the particular context in which the complaint arises. *See Clair*, 565 U.S. at 663. His central complaint was McCann's failure to file a motion for authorization to raise a successive *Atkins* claim. ROA.1255. The precise time McCann should have done so, according to White's argument, is at best unclear, but it could not be any later than when the Fifth Circuit adjudicated a similar request by Dexter Johnson *five years* ago. White suggests McCann's alleged conflict arose one year after White could have sought authorization to raise an *Atkins* claim in a successive petition. Appellant's Br. 35, 41. But this demand that counsel have prescience with respect to when an *Atkins* claim might succeed if raised or when the limitations period might accrue for a successive *Atkins* claim in the face of developing medical standards and jurisprudence fails to pinpoint an actual conflict of interest in McCann, particularly where outside counsel can still not identify the genesis of the conflict.

Relatedly, as the district court recognized, McCann's mere filing of a motion for authorization to raise an *Atkins* claim does not ineluctably give rise to an actual conflict of interest. ROA.2066. As discussed above, this has proven true in light of White's arguments in his pending motion for authorization, which seek avoidance of AEDPA's successiveness and limitations provisions by means other than an alleged conflict. That outside counsel repeatedly insist McCann's alleged conflict of interest and deficient representation are the only hope White has to successfully litigate an *Atkins* claim does not make it true. The district court did not err in purportedly refusing to acknowledge an actual conflict of interest. Appellant's Br. 34. The district court's non-final and non-binding opinion in *Johnson* does not compel a different conclusion.[5]

---

[5]     Outside counsel state that the interlocutory appeal of the district court's opinion in *Johnson* does not involve the issue of equitable tolling. Appellant's Br. 59. That is not accurate. While the district court certified one question for appeal, that did not limit this Court in whether it may accept all the questions posed by Respondent in that case. *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 398 (5th Cir. 2010) ("Under § 1292(b), it is the order, not the question that is appealable."). This Court's order granting an interlocutory appeal did not limit the questions to be answered to the one the district court granted. Unpublished Order, *Lumpkin v. Johnson*, No. 23-90003 (5th Cir. May 31, 2023).

Importantly, though, McCann developed evidence regarding White's intellectual functioning during the course of his representation of White. Prior to *Atkins*, McCann presented the state court Dr. Seth Silverman's report stating, among other things, that White had "compromised intellectual functioning," and borderline to low intellectual functioning.[6] SHCR-02 at 78–80, 83. After *Atkins*, McCann presented the state court Dr. Patricia Averill's report reflecting new IQ testing that produced a full-scale score of 78 with a range of measurement error between 74–83. SCHR-04 at 11–16. Like Dr. Silverman, Dr. Averill described White as having borderline intellectual functioning. *Id*. at 15. According to Dr. Averill, White was "ineligible for the [intellectual disability] label and associated protections," but suffered from the same limitations as the intellectually disabled. *Id*. Notably, the experts attributed at least some of White's intellectual deficits to his abuse of cocaine. *Id*. at 16 ("However, it is quite possible that [White's] cocaine use

---

[6]    At trial, Dr. Robert Yohman testified that he administered intelligence testing to White that resulted in a full-scale score of 76, which indicated borderline intellectual functioning. 21 RR 315. Dr. Dennis Nelson testified that he administered two screening tests for intellectual functioning that gave estimates of White's IQ as 85 and 87. 21 RR 391–92.

compromised an already compromised brain."); SHCR-02 at 75 (White used cocaine "over a period of time and at a rate that he would have suffered a loss of memory, decreased intellectual functioning, and significantly decreased [ ] ability to engage in deliberate thought at the time of the offense").

This led to McCann seeking authorization in 2015 of a claim adjacent to *Atkins*, one alleging White's "limited intellectual capacity" should have rendered his confession inadmissible. *In re White*, 602 F. App'x at 958. The resulting opinion in 2015 discussed that evidence and cited the Supreme Court's *Atkins* jurisprudence. *Id.* at 957, 958 n.4. Despite this publicly available opinion, neither White nor outside counsel took any action to rectify what was allegedly unethical conduct on McCann's part until mere weeks before White's scheduled execution.

In Johnson's case, this Court found his *Atkins* claim was previously unavailable to him because the DSM-5, a 2013 revision of the Diagnostic and Statistical Manual of Mental Disorders, "changed the framework for intellectual disability" such that an IQ score above 70 was no longer a bar to an intellectual disability diagnosis. *In re Johnson*, 935 F.3d at 292. Moreover, in *Hall v. Florida*, 572 U.S. 701, 721–22 (2014), "the Supreme

Court held there could not be a mandatory IQ number cutoff for consideration of intellectual disability." *In re Johnson*, 935 F.3d at 292. This Court explained that its earlier opinion in *In re Cathey*, 857 F.3d 221, 232–33, 237–38 (5th Cir. 2017), recognized that "[t]he significant change was in the medical methodology for evaluating the relevant disabilities and in courts' recognition of those changes." *In re Johnson*, 935 F.3d at 293. Therefore, when determining the relevant accrual date for Johnson's limitations period, the Fifth Circuit determined it was when the DSM-5 was published in 2013. *Id*. at 296.

While the Fifth Circuit left it to the district court to determine Johnson's entitlement to equitable tolling, it is instructive here that White's delay in seeking (a second time) substitution of counsel is *twice* as long as Johnson's delay. If the delays in *In re Johnson* and *In re Cathey* gave reason to "pause" to consider the timeliness of the petitioners' *Atkins* claims, *In re Johnson*, 935 F.3d at 296, White's significantly more egregious delay in seeking substitution of counsel—after having considered but foregone that option a decade ago—was plainly sufficient reason to decline the request. Therefore, this Court should affirm the denial of White's motion for substitution of counsel.

### C.    Substitution of counsel would be futile.

White was also not entitled to substitution of counsel because it would have been futile. Irrespective of White's allegations against McCann, White's proposed successive *Atkins* claim fails to satisfy § 2244(b) and is time-barred, and White does not have a prima facie claim of intellectual disability. Therefore, this Court should affirm the district court's denial of White's motion for substitution of counsel.

### 1.    White's *Atkins* claim is impermissibly successive.

Substitution of counsel may be denied where it would be a futile exercise. *Clair*, 565 U.S. at 663–66. That is the case here, as White requested it solely for the purpose of seeking permission from this Court to raise a successive *Atkins* claim. As discussed at length in Respondent's opposition to White's motion for authorization to file a successive petition, White's *Atkins* claim is impermissibly successive. This is true despite White's allegations of misconduct on McCann's part.

A habeas petitioner must obtain leave from the court of appeals before filing a second habeas petition in the district court. *Adams v. Thaler*, 679 F.3d 312, 321 (5th Cir. 2012); *see Felker v. Turpin*, 518 U.S. 651, 664 (1996); 28 U.S.C. § 2244(b)(3)(A). White has filed both an initial

37

federal habeas petition, which was denied in 2011, ROA.1158–86, and a motion for authorization to file a successive petition, which was denied in 2015, *In re White*, 602 F. App'x at 958. Therefore, he would be required to satisfy an exception under 28 U.S.C. § 2244(b).

Prior to the filing of his pending motion for authorization, White had not raised an *Atkins* claim in federal court. *See* 28 U.S.C. § 2244(b)(1). Therefore, to establish an entitlement to file another federal petition, White must show his *Atkins* claim was unavailable to him in 2015 when his motion for authorization was denied. 28 U.S.C. § 2244(b)(2)(A) (requiring that a claim presented in a successive application "that was not presented in a prior application shall be dismissed unless" it relies on a new, retroactive rule of constitutional law);[7] *see In re Pruett*, 711 F. App'x 732, 736 (5th Cir. 2017) ("[T]here is no reason why Pruett could not have discovered the contamination of the murder weapon before filing his [earlier] 2015 motion to file a successive habeas petition."); *United States*

---

[7]   An *Atkins* claim cannot satisfy § 2244(b)(2)(B). *In re Johnson*, 935 F.3d at 291 n.1; *see In re Webster*, 605 F.3d 256, 258–59 (5th Cir. 2010) (a successive *Atkins* claim based on new evidence would not negate the evidence of the petitioner's guilt).

*v. Jones*, 796 F.3d 483, 485 (5th Cir. 2015) ("[H]abeas applications are defined in relation to the judgment that they attack[.]" (citing *Magwood v. Patterson*, 561 U.S. 320, 332 (2010)).

As mentioned above, White intends to follow the path laid by Dexter Johnson. To do so, White would be required to show *Atkins* was previously unavailable "as to him," despite it having been decided almost a decade before this Court denied his initial federal petition.[8] *See In re Johnson*, 935 F.3d at 292. Johnson was convicted of capital murder in 2007 and sentenced to death. *In re Johnson*, 935 F.3d at 287. Six years later, the DSM-5 was released, "which changed the focus [of an assessment for intellectual disability] from specific IQ scores to clinical judgment." *Id.* at 293. Johnson's proposed successive *Atkins* claim relied on the updated standards in the DSM-5, *id.* at 292, as well a current full-scale IQ score of 70, *id.* at 293, which was within the *Atkins* range. This

---

[8]     This assumes *In re Cathey* and *In re Johnson* remain good law. As noted above, this Court recently granted the Director's request in *In re Johnson* for an interlocutory appeal. Unpublished Order, *Lumpkin v. Johnson*, No. 23-90003 (5th Cir. May 31, 2003), ECF No. 2-1. The appeal seeks review of, among other issues, whether there can be judicially created exceptions to § 2244(b)(2)(A), which, if answered in the negative, would bar White's attempt to file a successive petition.

Court explained, "[w]hat opens the door for Johnson is the *Cathey* decision, which has precedentially determined that it is correct to equate legal availability with changes in the standards for psychiatric evaluation of the key intellectual disability factual issues raised by *Atkins*." *Id.* at 294; *see In re Soliz*, 938 F.3d 200, 203–04 (5th Cir. 2019) (discussing *In re Johnson*). The same cannot be said for White.

First, White filed a motion for authorization in January 2015 seeking permission to file a successive petition raising a claim related to his "limited intellectual capacity" and his purported invocation of his right to counsel. *In re White*, 602 F. App'x at 957–58. That motion for authorization postdated the issuance of the DSM-5 by almost two years, as well as the Supreme Court's decision in *Hall*.[9] *See In re Johnson*, 935 F.3d at 293. Therefore, it simply cannot be said that the DSM-5—the "change in diagnostic standards" that allowed Cathey and Johnson to proceed with their *Atkins* claims, *id.*—was unavailable when White filed his "prior application," 28 U.S.C. § 2244(b)(2)(A). *See In re Swearingen*,

---

[9] White's motion for authorization discussed *Hall* and its rejection of firm IQ cut-offs when assessing for intellectual disability. Mot. for Authorization 10–11, *In re White*, No. 15-20022 (5th Cir. Jan. 15, 2015).

935 F.3d 415, 417–18 (5th Cir. 2019) (listing the movant's prior motions for authorization and explaining the parties conceded his "claims were not raised in previous federal habeas *petitions*" (emphasis added)); *In re Pruett*, 711 F. App'x at 736; *Jones*, 796 F.3d at 485.

In *In re Swearingen*, the petitioner moved in 2019 for authorization to file a successive petition. 935 F.3d at 416. He had previously filed numerous postconviction challenges, including a motion for authorization in 2011. *Id.* (citing Op., *In re Swearingen*, No. 11-20276 (5th Cir. May 9, 2011)). This Court explained that because the petitioner's "claims were not raised in previous petitions," he had to show the claims were previously unavailable. *Id.* This Court held he failed to make such a showing. *Id.* at 419–22. Similarly, in *Jones*, a federal inmate filed a motion seeking sentencing relief in 2012, which the district court found was successive. 796 F.3d at 484 (citing 28 U.S.C. § 2255). He had previously filed a § 2255 motion in 1997 (which was dismissed as time-barred), in 1999 (which was dismissed as successive), and in 2005 (which was denied). *Id.* This Court explained that the petitioner's "present

application is successive to his 1997 and 1999 applications."[10] *Id.* at 487; *see In re Baptiste*, 828 F.3d 1337, 1339–40 (11th Cir. 2016); *Bennett v. United States*, 119 F.3d 470, 471–72 (7th Cir. 1997).

White argued in the court below that his prior motion for authorization would not act as a bar to another motion because this Court held in *Fierro v. Cockrell*, 294 F.3d 674, 680 (5th Cir. 2002), that a motion for authorization is not, itself, an application for a writ of habeas corpus. This Court in *Fierro*, however, interpreted and applied AEDPA's limitations provision, so the Court's reference to the successive provision was plainly dicta. *Id.* at 680–81 ("[T]he filing of [a motion for authorization] does not satisfy the one-year statute of limitations under the AEDPA."). Consequently, this Court's opinions in *Jones*, *In re Pruett*, and *In re Swearingen* are not affected under the rule of orderliness. *See*

---

[10]    In *United States v. Vargas-Soto*, a panel of this Court held the denial of a federal inmate's request for authorization to file a § 2255 motion meant that he "never actually filed the underlying motion" and § 2255(h)'s bar to previously available claims was inapplicable. 35 F.4th 979, 987–88 (5th Cir. 2022). But *Vargas-Soto* did not interpret and apply § 2244, which applies in this case. Further, the rule of orderliness renders *Vargas-Soto* non-controlling. As discussed above, this Court held in a 2015 published opinion concerning a § 2255 motion that the motion was successive where the inmate had previously sought and been denied authorization before. *Jones*, 796 F.3d at 487.

*Mullis v. Lumpkin*, 70 F.4th 906, 910 n.3 (5th Cir. 2023) (declining to find dicta in Supreme Court opinions overcame this Court's rule of orderliness). Indeed, this Court's opinions in *Jones* and *In re Swearingen*—published opinions—control.

Second, White's *Atkins* claim that was denied by the state court relied on the Flynn Effect to produce an actionable IQ score. Sixth Sub. Appl. for Writ of Habeas Corpus Pursuant to Tex. Code of Crim. Proc. Art. 11.071 9–10, *Ex parte White*, No. 07238470101 (180th Dist. Ct. Harris Co., Tex.). However, unlike in *In re Cathey*, 857 F.3d at 230, it cannot be said that the Flynn Effect was previously unavailable to White at the time his initial federal petition was denied in 2011 or when he filed his motion for authorization in 2015. Cathey's initial federal habeas petition was denied in 2004, before Texas courts began in 2006 to recognize the Flynn Effect. *Id*. Nor does White allege, as Cathey did, that evidence of an actionable IQ score was withheld by the State. *Id*. at 232–33.

Third, this Court in *In re Johnson* did not rely on an allegation regarding McCann's alleged conflict of interest or ineffectiveness in finding Johnson's *Atkins* claim was previously unavailable "as to him."

43

935 F.3d at 292. This Court instead relied entirely on the "change in diagnostic standards" to find Johnson could not have raised an *Atkins* claim in his initial federal petition. *Id.* at 293; *see In re Soliz*, 938 F.3d at 203–04; *In re Milam*, 838 F. App'x 796, 799 (5th Cir. 2020); Mem. & Order 15, *Johnson v. Lumpkin*, No. 4:19-CV-3047 (S.D. Tex. Oct. 28, 2022), ECF No. 78 ("The futility of raising an *Atkins* claim ended for Johnson when the DSM-V was published on May 18, 2013."). But again, those updated diagnostic standards were indisputably available to White when he filed his motion for authorization in 2015. *See In re Pruett*, 711 F. App'x at 736. Therefore, not only is White's substitution request significantly more dilatory than Johnson's, but he also fails to identify any basis on which this Court can grant him authorization to file a successive federal petition raising an *Atkins* claim. That White is disentitled to authorization to raise a successive *Atkins* claim is not due to any alleged conflict of interest of McCann's. *See In re Soliz*, 938 F.3d at 204 (rejecting the petitioner's reliance on *In re Johnson* and *In re Cathey* where he filed his amended federal petition in 2016, "years after the DSM-5 was published," and after the *In re Cathey* decision, so "any claim similar to

44

what we discussed in *Johnson* and earlier in *Cathey* was available to Soliz at the time of his earlier application for a writ of habeas corpus").

Substitution of counsel would have been futile. Therefore, this Court should affirm the district court's denial of White's motion. *See Clair*, 565 U.S. at 663–66.

### 2.    White's successive *Atkins* claim is time-barred.

Substitution of counsel would have been futile also because a successive *Atkins* claim would be time barred. *See In re Campbell*, 750 F.3d 523, 532 n.9 (5th Cir. 2014); *see also In re Jones,* 998 F.3d 187, 189 (5th Cir. 2021). White's claim is plainly time barred, and he cannot justify a decade's worth of equitable tolling to make it timely.

Section 2244(d)(1) applies a one-year limitations period to any application for writ of habeas corpus. In this case, the limitations period begins running from the latest of either:

(C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1); *In re Jones,* 998 F.3d at 189. White's claim is untimely whether measured from publication in 2013 of the DSM-5 or the Supreme Court's opinions in *Moore v. Texas*, 581 U.S. 1 (2017) (*Moore I*), or *Moore v. Texas*, 586 U.S. 133 (2019) (*Moore II*). *See In re Burton*, 111 F.4th 664, 666 (5th Cir. 2024); *In re Sparks,* 939 F.3d 630, 632 (5th Cir. 2019); *In re Jones,* 998 F.3d at 189–90 (even considering *Moore II*, decided in 2019, petition filed in 2021 was still untimely).[11]

Indeed, White admits his claim would be untimely and that he would require the benefit of equitable tolling, but he cannot show he is entitled to it. A habeas petitioner is entitled to equitable tolling of the limitations period if he shows (1) that he has pursued his rights diligently and (2) extraordinary circumstances prevented timely filing. *Holland v. Florida*, 560 U.S. 631, 649 (2010). Even assuming Dexter Johnson could justify enough equitable tolling to make his claim timely, White cannot.

---

[11]    *See* Mem. & Order 18 n.14, *Johnson v. Lumpkin*, No. 4:19-CV-3047 (S.D. Tex. Oct. 28, 2022), ECF No. 78 (noting this Court "has not yet decided whether to measure an inmate's compliance with the limitations period from the publication of the [DSM-5] or from *Moore I*").

46

As discussed above, White expressed dissatisfaction with McCann's performance ten years ago. ROA.1537–39. White has not suggested he made any further attempt to secure new counsel or made any effort to notify this Court of his dissatisfaction prior to or soon after his previously scheduled execution in 2015. *Cf. In re Lewis*, 484 F.3d 793, 797 (5th Cir. 2007) (rejecting argument for equitable tolling based on the withdrawal of the petitioner's appointed counsel on the day the petitioner "became eligible to raise his *Atkins* claim"). Indeed, it appears White took no further action during the intervening decade until his execution was scheduled a second time when White, himself, wrote to outside counsel. ROA.1535.

To the extent White relies on his purported intellectual disability as reason not to require him to exercise the diligence needed to receive equitable tolling, such an argument would be undermined by the fact that he has exhibited an ability to seek assistance from outside counsel. ROA.1535–40; *see Jones v. Stephens*, 541 F. App'x 499, 505 (5th Cir. 2013) ("Although mental illness may warrant equitable tolling, a petitioner (i) must make a threshold showing of incompetence and (ii) must show that this incompetence affected his ability to file a timely habeas

47

petition[ ].”), 505 n.34 (collecting cases); *Smith v. Kelly*, 301 F. App'x 375, 377 (5th Cir. 2008) (“[W]hile mental illness *may* [equitably] toll AEDPA's statute of limitations, it does not do so as a matter of right.” (emphasis in original)); *see also Holland,* 560 U.S. at 653 (Holland wrote his attorney numerous letters; repeatedly contacted the state courts, clerks, and the Florida State Bar Association to have attorney removed from his case; and upon learning counsel had missed AEDPA deadline, prepared his own habeas petition *pro se* and filed it with the District Court); *Manning v. Epps*, 688 F.3d 177, 185 (5th Cir. 2012) (a counseled petitioner “seeking to establish due diligence must exercise diligence even when they receive inadequate representation”); *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004) (Sotomayor, J.) (“[T]he act of retaining an attorney does not absolve the petitioner of his responsibility for overseeing the attorney's conduct or the preparation of the petition.”).

In light of White's demonstrated willingness and ability to seek assistance from outside counsel, and his lack of diligence in doing so, he could not show an entitlement to sufficient equitable tolling to make his successive *Atkins* claim timely. Therefore, this Court should affirm the

district court's denial of White's futile motion for substitution. *See Clair*, 565 U.S. at 663–66.

### 3.    White is not intellectually disabled.

To obtain authorization to raise a successive *Atkins* claim, White must also make a prima facie showing that he is intellectually disabled. *See In re Campbell,* 750 F.3d at 530. White has presented an *Atkins* claim in state court, which the CCA has rejected. Order, *Ex parte White*, No. WR-48-152-09 (Tex. Crim. App. Sept. 18, 2024). That adjudication was on the merits. *Busby v. Davis,* 925 F.3d 699, 709 (5th Cir. 2019) (citing *Ex parte Blue,* 230 S.W.3d 151, 163 (Tex. Crim. App. 2007)). Therefore, the CCA's *Atkins* ruling is ultimately subject to AEDPA's relitigation bar. *Id.* at 710–11.

To demonstrate he is intellectually disabled and thus ineligible for execution, White must show: (1) he has deficits in intellectual functioning; (2) he has deficits in adaptive functioning; and (3) the onset of these deficits occurred during childhood or adolescence. *Moore I*, 581 U.S. at 7; *Petetan v. State*, 622 S.W.3d 321, 333 (Tex. Crim. App. 2021). In support of his claim in state court, White presented an IQ score of 78, which was presented in support of his 2009 subsequent habeas

application. *See* ROA.2018–23; SCHR-04 at 11–16. He also presented a report by Dr. Hupp who stated application of the Flynn Effect to White's score of 78 would adjust the score downward at least to 75, and the score could be, accounting for the lower end of the standard error of measurement, possibly as low as 68. ROA.2022. Dr. Hupp also concluded White exhibited adaptive deficits during the developmental period. ROA.2022.

White's evidence does not present a prima facie claim for intellectual disability. Under the DSM-5-TR, individuals with intellectual disability have scores approximately two standard deviations or more below the population mean, including a margin for measurement error, or a score of 65–75. DSM-5-TR at 42; *see In re Cathey*, 857 F.3d at 236. According to Dr. Averill, who administered the test that produced an IQ score of 78, applying the standard error of measurement to White's unadjusted IQ score produced a range of 74–83. ROA.2120. According to Dr. Hupp, the range would be 71–85 if applying a seven-point error of

measurement.[12] ROA.2022. Based on the Supreme Court's decision in *Moore I*, even the low end of the range of error does not fall within the range of intellectual disability sufficient to trigger an analysis of adaptive deficits. *See Moore I*, 581 U.S. at 14 ("Because the lower end of Moore's score range falls at or below 70, the CCA had to move on to consider Moore's adaptive functioning.").

This Court has held the CCA reasonably determined that a petitioner could not demonstrate subaverage intellectual functioning when the lowest IQ score he provided was a 74 on the WAIS-IV (yielding a range from 70–79), which the test's administrator described as "Borderline." *Busby*, 925 F.3d at 716–20; *see* ROA.2121 ("[T]his assessment and Mr. White's records indicate that he is functioning in the borderline range of intelligence[.]"). This Court reached a similar conclusion in another opinion that postdated *Moore I*, where the petitioner's score, considered with the range of error, did not fall at or

---

[12]    It is at least questionable why Dr. Hupp suggests such a larger range of error should apply than Dr. Averill—who conducted the assessment that produced the score of 78—reported in 2008. *Compare* ROA.2120, *with* ROA.2022.

below 70. *Green v. Lumpkin*, 860 F. App'x 930, 940 (5th Cir. 2021) (per curiam) (holding that where lowest IQ score submitted was 78, the state court was not unreasonable under *Moore I* for determining the petitioner was not intellectually disabled because petitioner could not satisfy the first *Atkins* prong). This Court stated that reason alone was enough to foreclose relief on the *Atkins* claim. *Id.* The same is true here.

As for the Flynn Effect, adjustment of IQ scores is not required. The Flynn Effect posits that over time, IQ scores of a population rise without corresponding increases in intelligence and, thus, the test must be re-normed. *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007). The Flynn Effect "may affect" a test score. DSM-5-TR at 38; *see Ex parte Cathey*, 451 S.W.3d 12–14 (Tex. Crim. App. 2015). Importantly, though, the DSM-5-TR does not require adjusting a score downward for the Flynn Effect. DSM-5-TR at 38. Additionally, Texas law holds that an IQ score "may not be changed" to adjust for the Flynn Effect. *Cathey*, 451 S.W.3d at 18.[13]

---

[13]    The CCA has noted that practice effects and the Flynn Effect "may affect test scores," *Petetan*, 622 S.W.3d at 338 (citing DSM-5 at 37), and courts "may consider the Flynn Effect and its possible impact on IQ scores generally." *Ex parte Cathey*, 451 S.W.3d at 5, 18. And even then, courts "may consider that effect only in the way that they consider an IQ examiner's assessment of malingering, depression, lack of concentration, and so forth." *Id.* at 5.

Further, this Court "has not recognized the Flynn effect," *Brumfield v. Cain*, 808 F.3d 1041, 1060 n. 27 (5th Cir. 2015),[14] and the Supreme Court has called it a "controversial theory." *Dunn v. Reeves*, 594 U.S. 731, 736–37 (2021) (per curiam). Without this adjustment, White cannot make a prima facie showing on the first criteria for intellectual disability, making it unnecessary to assess his adaptive behavior. *See Moore I*, 581 U.S. at 15 ("[W]e require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits.").

Moreover, as White's expert Dr. Hupp has acknowledged, ROA.2021, "White has never been administer[ed] nor evaluated on a standardized measure of adaptive functioning." The DSM-5-TR requires

---

[14]    Unlike *In re Cathey*, White does not have other evidence—in *Cathey,* it was purported evidence that Cathey's IQ was below 73—to support an inference raised by the Flynn Effect that his score of 78 was artificially inflated. 857 F.3d at 236–37. Importantly, neither *In re Cathey* nor *In re Johnson* contradict *Brumfield* because they do not resolve the issue regarding application of the Flynn Effect. Moreover, unlike *In re Johnson*, White has not produced a new full scale IQ score within the *Atkins* range of 70 or below. *In re Johnson*, 935 F.3d at 292.

"[t]he diagnosis of intellectual developmental disorder is based on both clinical assessment and standardized testing of intellectual functions, standardized neuropsychological tests, and standardized tests of adaptive functioning."[15] DSM-5-TR at 38. White's *Atkins* claim is, therefore, facially inadequate to justify authorization.

White fails to present evidence of either significantly subaverage intellectual or adaptive deficits. White cannot make out a prima facie *Atkins* claim without such evidence, and substitution of counsel would be futile. Therefore, this Court should affirm the district court's order.

## D.    The district court did not err in denying White's motion.

White argues the district court erred in several ways. He asserts the court erred in not addressing McCann's conflict of interest. Appellant's Br. 45. But as discussed above, the district court appropriately declined to prematurely find a conflict of interest existed.

-------

[15]    Even then, reliance on affidavits of White's friends and family regarding decades-old recollections of White's behavior when he was a minor would be problematic even in the context of an "objective" measurement of White's adaptive behavior. *See Ex parte Cathey*, 451 S.W.3d at 20 (recognizing that a measurement of adaptive behavior was not designed to be administered retrospectively and was susceptible to reporters being "highly motivated to misremember").

Indeed, whether White's successive *Atkins* claim satisfies § 2244(b)(2)(A) is a question entirely separate from the allegation of a conflict, *see In re Johnson*, 935 F.3d at 292–93, and the district court was not required to accept White's assertion that McCann's conduct was the only basis on which he could ultimately achieve merits review of his *Atkins* claim. Relatedly, outside counsel's attempt to pretermit any effort McCann might make to achieve merits review of the claim by way of, e.g., arguing this Court should extend or alter its precedent, or any action this Court might take with respect to the motion for authorization, fails to identify error in the district court's order.

Moreover, much of outside counsel's argument as to the district court's order is the assertion that McCann purposefully stunted development of the *Atkins* claim to divert courts' attention from his failure to raise the claim earlier. Appellant's Br. 45, 51. The allegation is conclusory and baseless conjecture. Indeed, a more likely explanation for McCann's decision not to raise the claim earlier is that the chances of success on White's *Atkins* claim are—and have been—slim. As discussed above, the evidence supporting the claim is inadequate, but that is not the fault of McCann. That White achieved a score on an IQ test that put

him outside the protection of the Eighth Amendment is not the product of oversight or misconduct by McCann. Outside counsel's exercise in hindsight does nothing to show a meritorious *Atkins* claim has been waiting to be uncovered. Outside counsel cite this Court's opinion in *Battaglia* for support, but there it was the petitioner's "lack of counsel" that stunted development of a late developing (by its nature) claim of incompetency to be executed. 824 F.3d at 475–76. White has not been without counsel. Indeed, McCann developed the very evidence on which outside counsel rely to suggest White is intellectually disabled. Appellant's Br. 48.

For the same reason, outside counsel's reliance on *In re Hearn*, 376 F.3d 447, 453 (5th Cir. 2004) (*Hearn I*), is misplaced. Appellant's Br. 47–48. There, the petitioner "lost his court-appointed habeas counsel on the very day he became eligible to raise his *Atkins* claim." *Hearn I*, 376 F.3d at 454. This Court later clarified its holding, explaining it applied in extremely limited circumstances: where the petitioner has filed state and federal habeas petitions, presently lacks appointed counsel, and has proposed an intellectual disability claim that was not previously available. *In re Hearn*, 389 F.3d 122, 123 (5th Cir. 2004) (*Hearn II*); *id.*

56

("In the ordinary case, where the issue of [intellectual disability] was explored at trial for [ ] mitigation purposes, there will likely be a state court record from which to determine whether a prima facie case of [intellectual disability] exists." (citation omitted)). Again, White has not lost appointed counsel. McCann has developed the very claim outside counsel seek to relitigate.

Relatedly, outside counsel also assert substitution of counsel was required because McCann presented a facially deficient *Atkins* claim to the state court. Appellant's Br. 37. This is because, counsel aver, the CCA does not apply the Flynn Effect, which White's expert applied to adjust White's IQ score downward. Appellant's Br. 37. But that is not accurate. The CCA has explicitly stated "factfinders may 'consider'" the Flynn Effect just as they may consider other facts that might affect an IQ score. *Ex parte Cathey*, 451 S.W.3d 1, 5 (Tex. Crim. App. 2014). Moreover, White's expert, Dr. Hupp, provided several reasons White's IQ score of 78 was, in his opinion, an overestimation of White's intelligence.[16]

_____

[16]    It should be noted, however, that outside counsel overinterpret Dr. Hupp's opinion. Counsel assert Dr. Hupp stated White's true IQ score is "closer to 68." Appellant's Br. 25, 44. But Dr. Hupp's affidavit stated that adjustment

ROA.2022. This was entirely in keeping with the CCA's precedent. At most, outside counsel proffer nothing but their hindsight and disagreement with McCann's strategic choices to show White has been denied his rights under § 3599. Such conjecture does nothing to show error in the district court's denial of the motion for substitution of counsel. This Court should affirm the district court's order.

## III. This Court Should Deny White's Request for a Stay of Execution.

### A.    White is not entitled to a stay under *McFarland*.

The Supreme Court in *McFarland v. Scott* stated that permitting a petitioner's execution without affording appointed counsel the opportunity "meaningfully to research and present" an initial habeas petition would be improper. 512 U.S. 849, 858 (1994). But a court would not abuse its discretion where the petitioner "inexcusably ignores this opportunity and flouts the available process." *Id*.

Under this standard, White plainly failed to show an entitlement to a stay of execution. White, with the continuous representation by

---

of White's score to account for the Flynn Effect to 75, and with a larger range of measurement error than that applied by the original evaluator, Dr. Averill, White's IQ is "possibly" as low as 68. ROA.2022.

McCann for more than two decades, undeniably had the opportunity (and did) fully litigate his state and federal habeas challenges, including the filing a motion for authorization to file a successive federal petition and obtaining a stay of execution in 2015. *In re White*, 602 F. App'x at 958; *Ex parte White*, 2015 WL 375733, at *1. Consequently, neither substitution of counsel nor a stay of execution was necessary to make White's statutory right under § 3599 effective where he has enjoyed that right for decades. This case is of the type described by this Court in *Hearn II*, in which White's intellectual functioning was developed for mitigation purposes at trial and on appeal. *See Hearn II*, 389 F.3d at 123. White was not entitled to last-minute substitution of counsel and to force an "automatic stay" where he had more than "sufficient time to file a petition" alleging a prima facie *Atkins* claim. *Id*.; *see Battaglia*, 824 F.3d at 475 (granting a stay of execution where the petitioner was abandoned by appointed counsel and a stay was needed to make the § 3599 right to counsel meaningful). It was neither legal error nor an abuse of the district court's discretion to deny a stay of execution where White has undeniably had the opportunity to make "effective" and meaningful use of his right to appointed counsel under § 3599. *See Hearn II*, 389 F.3d at 123;

*Battaglia*, 824 F.3d at 475. Indeed, White continues to receive the benefit of that right today.

Moreover, as discussed above, White expressed dissatisfaction with McCann in 2014, but after the stay of his execution in 2015, White waited idly for a decade until another execution date was scheduled. Under *McFarland*, White was disentitled to a stay. *See McFarland*, 512 U.S. at 858 ("[I]f a dilatory capital defendant inexcusably ignores [the opportunity to request counsel and file a federal habeas petition] and flouts the available processes, a federal court presumably would not abuse its discretion in denying a stay of execution."). Therefore, his motion for a stay of execution should be denied.

### B.   White is not entitled to a stay under *Nken*.

In considering whether to grant a stay under *Nken v. Holder*, 556 U.S. 418 (2009), a court considers (1) whether the petitioner has made a strong showing that he is likely to succeed on the merits, (2) whether the petitioner will be irreparably injured absent a stay,[17] (3) whether

---

[17]   As this Court has explained, the merits of the petitioner's "case are essential to [the court's] determination of whether he will suffer irreparable harm if a stay does not issue." *Walker v. Epps*, 287 F. App'x 371, 375 (5th Cir. 2008).

issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies. *Charles v. Stephens*, 612 F. App'x 214, 218 n.7 (5th Cir. 2015) (citing *Nken*, 556 U.S. at 425–15). As discussed below, White fails to show an entitlement to a stay under the *Nken* factors. He fails to make a strong showing that he is likely to succeed on a motion for authorization to file a successive federal petition either with McCann's assistance or outside counsel's.

In *Battaglia*, this Court granted a stay of execution because the petitioner was not meaningfully represented by counsel due to appointed counsel's abandonment of him, appointed counsel's abandonment precluded the development of evidence that the petitioner was incompetent to be executed, the possibility of irreparable harm to the petitioner weighed in his favor, and the petitioner's dilatory filing was due to the late-developing nature of a *Ford*[18] claim and appointed counsel's abandonment. 824 F.3d at 475–76. Such circumstances do not exist here. As discussed above, White has been continuously represented by appointed counsel who have never abandoned him, and there is

---

[18]    *Ford v. Wainwright*, 477 U.S. 399 (1986).

nothing late developing about the nature of White's proposed *Atkins* claim. White has proffered a successive *Atkins* claim, but he is not entitled to authorization to file it irrespective of outside counsel's accusations against McCann. For the same reasons, White cannot show he will suffer irreparable harm if denied a stay, as he cannot be harmed by the denial of additional process to which he is not entitled. *See Walker*, 287 F. App'x at 375. Consequently, White fails to show he is entitled to a stay.

Finally, the State, the victims of White's numerous murders, and the public have a strong interest in carrying out White's sentence. White has challenged his capital murder conviction and death sentence for more than twenty years during which he has been ably represented by McCann. As discussed above, White fails to show an entitlement to reinitiate his federal habeas proceedings, that McCann's representation of him has been inadequate, or that he is intellectually disabled. Considering the circumstances in this case, a stay of execution should be denied.

## CONCLUSION

The Director respectfully requests that this Court dismiss this appeal from the denial of White's motion for substitution of counsel or, alternatively, affirm the district court's order denying White's motions for substitution of counsel and a stay of execution.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Jefferson Clendenin
JEFFERSON CLENDENIN
Assistant Attorney General
Texas Bar No. 24059589
    *Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1600
Fax: (512) 320-8132
Email: jay.clendenin@oag.texas.gov

*Attorneys for Respondent*

63

# CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2024, I electronically filed the foregoing document with the clerk of the court for the United States Court of Appeals for the Fifth Circuit, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to counsel of record who have consented in writing to accept this Notice as service of this document by electronic means.

s/ Jefferson Clendenin
JEFFERSON CLENDENIN
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that this Brief in Response complies with Federal Rule of Appellate Procedure 32(a) in that it contains 12,910 words. Microsoft Word, Century Schoolbook Font, 14 points.

s/ Jefferson Clendenin
JEFFERSON CLENDENIN
Assistant Attorney General

## ELECTRONIC CASE FILING CERTIFICATIONS

I do hereby certify that: (1) all required privacy redactions have been made; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus scanning program and is free of viruses.

s/ Jefferson Clendenin
JEFFERSON CLENDENIN
Assistant Attorney General